# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# WESTERN DIVISION

KYM MANULA, an Individual; and                                                              PLAINTIFFS
LIL' OUTLAWS PONY CAMP, LLC, a
Colorado Limited Liability Company, d/b/a
SPRADDLE CREEK RANCH

v.                                         No. 4:06CV01107 JLH

RICK WHEAT                                                                                    DEFENDANT

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Kym Manula and Lil' Outlaws Pony Camp, LLC, d/b/a Spraddle Creek Ranch, brought this action against Rick Wheat for breach of contract, unjust enrichment, fraud, deceit, breach of express warranty, breach of implied warranty of fitness for a particular purpose, breach of implied warranty of merchantability, and deceptive trade practices arising out of a sale of 30 horses. Following a two-day bench trial, this case is ripe for decision.

## I. THE PARTIES

Kym Manula is the owner of Lil' Outlaws Pony Camp, LLC, which does business as Spraddle Creek Ranch. She is the sole member of the limited liability company. She has ridden horses for most of her life and has years of experience in working as an outfitter and in guiding trail rides.

In 2002, Manula purchased a ranch in Eagle County, Colorado, where she operated a horse and pony camp, primarily for children who had little or no experience with horses. In 2003, Manula purchased the Spraddle Creek Ranch, which operates on and leases land from a national forest. Spraddle Creek Ranch is a trail riding business approximately one mile from Vail, Colorado. It serves primarily "dudes," *i.e.*, adults and children with little or no experience riding horses. Spraddle Creek Ranch offers trail rides of one hour, two hours, and three hours. The customers ride horses

that are walking nose-to-tail in single file along a well-established trail in the national forest. The season for Spraddle Creek Ranch runs from May through September.

Rick Wheat is an experienced horseman who owns a ranch near Mt. Pleasant, Arkansas. Wheat has been a horseman for many years. He previously owned a business that produced rodeos, and he sold that business. He has owned and operated a trail riding business. He is a horse trainer who has trained horses and conducted clinics on training horses throughout the United States, in Canada, and in other countries. He has patented a device known as the Noavel Headstall, which he uses in training horses and which he sells through distributors. The Noavel Headstall is similar to a halter, but it can be used to create pressure on pressure points to teach the horse when he is behaving inappropriately. The Noavel Headstall has no bit.

## II.  THE CONTRACT

During the first week of September 2003, Manula traveled with her ranch foreman, Trevor Schlegel, and a farrier, Gary Hoza, to Arkansas for the purpose of exploring whether she might buy horses from Wheat for use at Spraddle Creek Ranch. Hoza was not only a farrier but also a Noavel Headstall dealer. He had introduced Manula and Wheat to one another. Manula spent approximately three days in the area. Wheat had on his ranch a large number of horses, which he showed to Manula. He also showed her horses in other places. They rode some of the horses. Wheat gave demonstrations on his training methods using the Noavel Headstall.

By the conclusion of the visit, Manula and Wheat had reached an oral agreement. After Manula returned to Colorado, Wheat reduced the oral agreement to a written contract, signed it, and sent it to Manula, who also signed it. The written contract provided:

> Rick Wheat will deliver 30 (Geldings) trail riding horses to Kym Manula on or before May 25th, 2004.

**Each of the horses will have:**

**A current negative coggins**

**A Noavel brand on their right side**

**A Noavel Headstall**

**A rope halter**

**Each horse will be wormed 4 times between Sept. 2003 to May 2004.**

**Each horse will be in excellent physical condition (each horse being provided with nutritious feed and hay from Sept. 2003 thru May 2004).**

**Each horse will be trained as trail horses using the Rick Wheat Training Method.  (Kym, observed the training method during her visit to Rick's ranch Sept. 2 thru Sept. 5th).**

**The horses will be rode using a bit in their mouth, as well.**

Rick agrees to come with the horses when they are delivered, to help Kym with her trail riding program.  Rick agrees to provide Kym with 2 or 3 extra horses.  Kym can eliminate any of the 2 or 3 horses she chooses.  Rick wants Kym to sale [sic] the horses she eliminates and send him the money.

Kym Manula agrees to pay $1000.00 for each horse, for a total of $30,000.00.  Kym Manula agrees to send a $100.00 deposit for each horse, for a total of $3,000.00.  Kym Manula agrees to pay for the transportation of the 32 horses to Spraddle Creek Ranch in Vail, CO.  Balance of $27,000.00 due on delivery of horses to Vail, CO.

Signature  /s/ Rick Wheat                Date  9-11-2003
                Rick Wheat

Signature  /s/ Kym Manula              Date  9-26-03
                Kym Manula

Despite the fact that the oral agreement was reduced to a written contract, each side has urged that the agreement includes terms favorable to that side that are not in the written contract; and, conversely, each side denies that the agreement includes terms favorable to the other party that are not in the written contract.  For example, in response to a complaint by Manula that the horses

3

delivered to her were too young and immature to be ridden by inexperienced horsemen on trail rides, and in response to Manula's complaint that three of the horses delivered to her were stallions, Wheat contends that, when she was on his ranch in early September 2003, Manula, herself, selected the horses to be trained and delivered in May 2004, that she specifically selected two-year-old horses, and that she specifically selected the three stallions. Manula denies that she selected the horses that would be trained and delivered. According to her testimony, Wheat was to select the horses who would be most suitable to be ridden by "dudes" in a trail riding operation because he could view the performance of the horses during the training, cull out the ones that did not respond well in training, and replace them with horses that responded better to the training.

The written contract is consistent with Manula's testimony, not Wheat's. The contract was for "30 (Geldings) trail riding horses," not for 30 specific horses. Wheat is an experienced businessman and an experienced horseman. Manula is an able and intelligent businesswoman. If the agreement had been for 30 specific horses selected by Manula while she was in Arkansas in early September, Manula and Wheat would have prepared a list identifying the specific horses to be delivered the following May, both parties would have had a copy of the list, and the list would have been included in the written contract, so as to make sure that there would be no dispute as to whether the horses delivered in May 2004 were the ones selected by Manula in September 2003. Likewise, if Manula had specified that she wanted two-year-old horses, that specification would have been included in the written contract; and if Manula had selected any stallions to be included the written contract would have so stated instead of calling for delivery of 30 geldings.

Manula argues that the contract included a requirement that each of the horses be trained to pull a wagon. Wheat denies that the contract included that term. The written document does not include a requirement that each of the horses be trained to pull a wagon, so the written document on

4

this issue supports Wheat's testimony, not Manula's. If it had been a term of the contract that each horse would be trained to pull a wagon, Manula would have insisted that that term be included in the written contract. Manula argues that the contract could be amended by an oral agreement of the parties, but the evidence did not show that the parties orally amended the contract after September 26, 2003, when Manula signed it, to include a requirement that all of the horses be trained to pull a wagon. There was evidence that while Manula was in Arkansas in early September 2003 Wheat explained his training process, which includes starting the horses to pull an implement before they are ridden, but the evidence does not show that after the contract was executed the parties orally agreed to modify it to include a requirement that the horses be trained to pull wagons.

The consideration was "$1000.00 for each horse, for a total of $30,000.00." In an affidavit filed in Colorado[1] and introduced in this case as Plaintiffs' Exhibit 97, Wheat explained the terms of the contract as follows:

> During this visit to evaluate my horses and sometime when the Plaintiff was preparing to leave I explained to her that I also had a local buyer for the horses. I informed the Plaintiff that the terms for the local sale would be the same for her: payment before the horses left my land, I would sell each horse at $1,000 and would add into the deal the Noavel Headstalls for each horse plus rope halter. I stated to the Plaintiff that this was an additional benefit of $175 per horse that she was not having to pay for. We discussed that the Plaintiff would purchase thirty horses. Thirty two [sic] horses were to be picked up by her transport company to provide Ms. Manula, Plaintiff, with the ability to reject two horses and send them back to Arkansas or sell them and keep her profit over the $1,000 per horse (if any).

Wheat and Manula disagreed at trial as to how to characterize the consideration that Manula paid to Wheat. Manula characterized the consideration as $1,000 per horse, with the Noavel Headstalls included without charge. Wheat characterized the consideration as $850 per horse plus $150 per

---

[1] Manula first sued Wheat in Colorado. Wheat submitted the affidavit in support of a motion to dismiss for lack of jurisdiction. The Colorado court granted Wheat's motion to dismiss for lack of jurisdiction, after which Manula commenced this action.

Noavel Headstall. Wheat's affidavit is consistent with Manula's testimony at trial but inconsistent with his own testimony at trial. Because Wheat's affidavit characterized the consideration for the transaction in a manner consistent with Manula's testimony at trial but inconsistent with his testimony at trial, the Court will accept the characterization in Wheat's affidavit and in Manula's trial testimony rather than the characterization by Wheat at trial.

The written contract provided that Manula would pay a deposit of $100 for each horse for a total deposit of $3,000. Manula paid the deposit by check dated September 26, 2003. The written contract also called for Manula to pay for transportation of the horses to Spraddle Creek Ranch, which she did at a cost of $2,750. The written contract provided that the balance of $27,000 owed on the purchase price would be due on delivery of the horses to Vail, Colorado. In April or May of 2004, the parties agreed to an oral modification of that term of the contract. Arrangements were made for Manula to pay by credit card in advance of loading the horses on the trailer to be transported to Colorado. The parties disagree as to who instigated this oral modification of the contract, and they disagree as to the reason for the oral modification, but it is undisputed that they did agree to this modification of the contract, and it is undisputed that Manula paid the balance of $27,000 by credit card before the horses were loaded onto a trailer to be transported from Wheat's ranch to the Spraddle Creek Ranch.

Both parties have briefed and argued the case on the assumption that this is an Arkansas contract governed by Arkansas law, and the Court will accept that assumption. The transaction at issue is governed by the Uniform Commercial Code as adopted in Arkansas, Ark. Code Ann. § 4-1-101, *et seq*. (Repl. 2001). The horses were "goods" as that term is defined in Ark. Code Ann. § 4-2-105(1). Wheat was a "merchant" as that term is defined in Ark. Code Ann. § 4-2-104(1). The written contract is a final written expression of the agreement between the parties pursuant to Ark.

6

Code Ann. § 4-2-202. Wheat made express warranties that each horse would be in excellent condition, that each horse would be trained as a trail horse using the Rick Wheat Training Method as demonstrated to Manula in early September 2003, and that each horse would be rode using a bit in his mouth. *See* ARK. CODE ANN. § 4-2-313. At the time Wheat and Manula entered into the contract, Wheat knew of the particular purpose for which the horses were required. He knew that Manula was relying on his skill and judgment to select and furnish suitable horses. Therefore, Wheat made an implied warranty that the horses that he delivered would be suitable to be ridden by novices, whether adults or children, on the trail rides at Spraddle Creek Ranch. The implied warranty of fitness for a particular purpose was not excluded and therefore is applicable. ARK. CODE ANN. § 4-2-315. The implied warranty of merchantability was not excluded and therefore is applicable. ARK. CODE ANN. § 4-2-314.

### III. PERFORMANCE OF THE CONTRACT

Needless to say, the parties are in substantial disagreement as to whether the contract was performed. Manula contends that the horses arrived malnourished, sickly, and wild. Wheat says that the horses were well fed, in good health, and very tame. After reviewing the photographs of the horses and hearing all of the testimony, the Court concludes that the truth is somewhere in between.

It is undisputed that on May 10, 2004, the horses were loaded onto a transport trailer to be hauled from Mt. Pleasant, Arkansas, to Spraddle Creek Ranch. Thirty-two horses were loaded and tied in the trailer. Two horses suffered broken necks and died within two hours of the truck's departure. Upon discovering the dead horses, the truck driver drove the truck and trailer to his employer's place of business in Diamond, Missouri, where the employer, who had experience with horses, had a stockyard. The corpses were unloaded, and the horses were all untied before the truck driver continued on the trip. Wheat says that the truck driver loaded the horses and tied them in Mt.

Pleasant. The truck driver says that Wheat loaded the horses and tied them. It is undisputed that the truck driver had no experience with horses. It is undisputed that when the horses were delivered in Colorado the truck driver had nothing to do with unloading them. It is unlikely that this truck driver, who had never hauled horses before, loaded those horses and made the decision to tie them. It is more likely that Wheat loaded the horses and made the decision to tie them.

The 30 remaining horses were delivered to Spraddle Creek Ranch on the afternoon of May 11, 2004. The names of the 30 horses are listed on Plaintiffs' Exhibit 42. It is undisputed that 22 of the horses were two years old. The horse named Sonny was 17 months old. Although not mentioned in the stipulation, the horses named Beans, Keith, and Spot were also two years old, according to records prepared by Wheat's veterinarian and introduced as Plaintiffs' Exhibit 75. A horse named Old Paint was three years old. The horses named Beetle Bailey, Opie, Loretta, and Barnaby were four years old. Three of the horses were stallions – Baldy Socks, Butters, and Sonny. Butters was a cryptorchid, *i.e.*, a stallion whose testicles had not descended.

Wheat did not come with the horses when they were delivered and did not help Manula with her trail riding program. Instead, he sent his son, Robert Wheat, and a hand named Ian Wallen. Robert and Ian had ridden the horses during the preceding several months. It is undisputed that Robert, Ian, and Trevor Schlegel unloaded the 30 horses. It is undisputed that Robert and Ian stayed two or three more days after unloading the horses and rode at least some of the horses.

Manula says that the horses were malnourished, wormy, and wild. She says that the horses evidently had not been broke. Wheat says that the horses had been wormed four times in accordance with the contract, that they had been well fed and were healthy. He says that the horses were well trained and very gentle.

Based upon all of the evidence, the Court finds it more likely than not that the horses were not wormed four times between September 2003 and May 2004. Wheat is an experienced businessman who must file tax returns each year. If he had wormed 30 horses four times between September 2003 and May 2004, it is more likely than not that he would have kept records so that he could deduct the cost of worming on his tax returns. He provided no records to show that he had purchased wormer to worm 30 horses four times between September 2003 through May 2004. It is more likely than not that, if he had wormed the horses four times during that period, he would have noted the dates on a calendar; but no such record was produced. If he had wormed 30 horses four times between September 2003 and May 2004, other persons (such as Robert and Ian) would have known about the worming and would have testified about it, but no witnesses testified that they saw Wheat worm the 30 horses four times or that they wormed the horses four times during that period.

The contract required that each horse be in excellent physical condition. One horse, Loretta, was sick upon arrival in Colorado and died approximately one month later. Another horse, Sonny, had dental problems, was unable to eat, and was malnourished. He was later traded to Gary Hoza in return for a farrier bill. A third horse, Taco, also had dental problems, was unable to eat, and was malnourished. With respect to the other twenty-seven horses, the photographs of the horses introduced into evidence, along with the testimony of the witnesses, has convinced the Court that the horses were not malnourished but neither were they in "excellent condition." The Court would characterize them as being in fair condition.

According to Manula, only four of the horses could be ridden (Opie, Beetle Bailey, Barnaby, and Old Paint) using a bit. There was no testimony by Rick Wheat, Robert Wheat, Ian Wallen, or anyone else that the horses had in fact been ridden using a bit. Because Manula's testimony on this

9

issue is uncontradicted by any other evidence in the record, the Court finds that 26 of the 30 horses could not be ridden with a bit.

In a draft, unsent letter dated July 18, 2005, Manula wrote that there were only two horses that she could trust, Leonard and Beetle Bailey. In a letter dated November 16, 2005, which Manula says she sent but which Wheat denies receiving, she wrote that only four of the horses "have qualified to be in my dude string." Manula contends that nearly all of the horses were wild and untamed. Schlegel and Joe Estes testified that upon arrival in Colorado the horses would not accept a saddle or a saddle blanket, would not stand still while they were brushed, and would bite, kick, and buck. On the other hand, Robert Wheat and Ian Wallen testified that all of the horses were gentle and well behaved both before and after they were delivered.

There is no documentary evidence to resolve this conflict in the testimony. However, the evidence does show that Manula sold most of the horses that she had acquired from Rick Wheat and either did not use them at Spraddle Creek Ranch or used them for a while but then discontinued doing so. Manula traded Sonny to Hoza in payment of a farrier bill in June 2004. The evidence shows that Sonny was unsuitable for use on the "dude string" in 2004. In July 2004, Manula sold 14 of the horses that she had bought from Wheat, all at a substantial loss. In July 2005, she sold one of the horses, Jim, for $2,000. In October 2005, she sold six more of the horses for an overall loss.[2] That Manula sold so many of these horses when she did means either that she had insufficient work for them or that they were unsuitable for the work. The evidence proved that the demand for trail rides at Spraddle Creek Ranch exceeded the capacity to provide those rides; in other words, Manula

---

[2] To summarize, Manula sold 15 of the horses in 2004 and 7 of them in 2005. Loretta died in 2004. According to Plaintiffs' Exhibit 56, Beetle Bailey died on August 6, 2006. Manula still owns 6 of the 30 horses that she acquired from Wheat.

was declining business during the summer of 2004.  It is more likely than not that, if these horses had been suitable for use by inexperienced riders in a trail riding program, Manula would have used them.  She had an economic motive to use them.  That she either did not use them or discontinued using them after a short period of time indicates that, more likely than not, the horses were unsuitable.

The Court listened carefully to the testimony of Rick Wheat, Robert Wheat, and Ian Wallen and did not hear convincing evidence that the 25 two-year-old horses and the one 17-month-old horse had received training sufficient to make horses of that age gentle enough and docile enough for use on a "dude string."  Horses suitable to be ridden by novice riders at a trail riding facility such as Spraddle Creek Ranch must be docile, placid, and obedient.  They must not run, buck, or rear in response to any occurrence, no matter how startling.  They must never kick or bite.  They must stay on the trail, stay in line, and stay close to the horse in front of them.  They must not pass the horse in front of them.  They must not pass the lead rider.  Stallions are never suitable for use on a "dude string."  While the Court cannot say that no two-year-old horse could ever be suitable for use on a "dude string," the Court is convinced that two-year-old horses ordinarily are not suitable, and that it would require extensive, specialized training to make a two-year-old horse suitable for this kind of work. Rick Wheat testified that he started these horses, meaning that he began their training and got them to the point where they could be ridden.  Robert Wheat and Ian Wallen testified that they would saddle the horses, ride one of them and lead the others.  The Court believes that they did so but doubts that this happened as often as they said.  Rick Wheat testified that he occasionally worked with the horses after getting them started, but he did not describe in any detail what he did with them, and the Court doubts that he did much beyond getting them started.  It seems likely that these horses behaved well enough when ridden by Robert Wheat and Ian Wallen, who were experienced

horsemen and with whom the horses were familiar, and it is probable that most of these horses could safely be ridden by other experienced horsemen; but the implied warranty of fitness required the horses to be suitable to be ridden by the customers of Spraddle Creek Ranch, *i.e.*, "dudes" or novices who would be riding on trails in the Rocky Mountains. Considering all of the evidence, the Court does not believe that the 25 two-year-old horses and the one 17-month-old horse could safely be ridden by novice riders on mountain trails in Colorado.

In summary, Wheat failed to perform under the contract in several respects. Three of the 27 horses were stallions, whereas the contract called for 30 geldings. The horses were not wormed four times between September 2003 and May 2004. Three of the horses (Loretta, Sonny, and Taco) were in poor condition. The others were in fair condition but not in excellent physical condition. The horses were not trained to be ridden using a bit. Rick Wheat did not come with the horses when they were delivered to help Manula with her trail riding program. Most importantly, Wheat breached the implied warranty of fitness for a particular purpose by sending horses that were not sufficiently mature, calm, gentle, docile, and well trained to be ridden by novice riders on mountain trails in Colorado.

Manula accepted the horses. *See* ARK. CODE ANN. § 4-2-606. She had a reasonable time after she discovered or should have discovered any breach to notify Wheat of the breach. *See* ARK. CODE ANN. § 4-2-607(3)(a). Manula's telephone records (Plaintiffs' Exhibit 38) show that Manula attempted to call Wheat once on May 12, once on May 13, and twice on May 14, and either she did not reach him or spoke to him only briefly. Manula's telephone records show a 15-minute telephone call to Wheat on June 8, 2004. Manula testified that during this telephone call she explained to Wheat that the horses were unsuitable but received little response. At trial, Wheat testified that he did not remember this conversation. In his affidavit, Wheat said that Manula complained during this

12

conversation about only one horse. The Court has concluded that it is more likely than not that the horses were unsuitable for use on Manula's "dude string." If the horses were unsuitable, Manula would have informed Wheat of her dissatisfaction during their telephone conversation. She is not timid. The Court concludes that Manula notified Wheat of the breach during the 15-minute telephone call on June 8, 2004.

Plaintiffs have not proven their claims for unjust enrichment, fraud, deceit, and deceptive trade practices. The Court finds that, except for Loretta, the horses were merchantable.

### IV. DAMAGES

Ark. Code Ann. § 4-2-714 provides:

(1) Where the buyer has accepted goods and given notification (§ 4-2-607(3)) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.

Ark. Code Ann. § 4-2-715 provides:

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include:

    (a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

> (b) Injury to person or property proximately resulting from any breach of warranty.

The first element of damages at issue is the difference between the actual value of the horses and the value that they would have had if they had been as warranted. Because this was an arms-length transaction, the Court will assume that the value of the horses as warranted was $1,000 per horse. One horse, Loretta, was sick when delivered on May 11, 2004, and died on June 15, 2004. Loretta had no market value. Manula traded Sonny to Hoza as payment of a farrier bill. Hoza testified that he gave Manula $1,100 in credit on the farrier bill for Sonny. Manula has recorded that she sold Sonny for $900. For purposes of the damage calculation, the Court will accept Hoza's testimony. With that exception, the Court will accept the calculation of Angela Hopkins at page 37 of her expert report (Plaintiffs' Exhibit 64) regarding the difference at the time and place of acceptance between the actual value of the horses and the value they would have had if they had been as warranted. Hopkins calculates that amount to be $10,114.61, including a loss of $1,000 for Loretta, a loss of $100 for Sonny, plus the remainder for the other 14 horses sold in July 2004. Because Manula sold Sonny for $1,100, not $900, the net loss on the value of the horses must be reduced by $200 to $9,914.61.

Although Manula sold seven of the horses in 2005, the Court does not believe that the prices for which those horses sold can reasonably be taken as evidence of the value of those horses on May 11, 2004. Enough time had passed that the condition of those horses in 2005 may have been much better or much worse than their condition had been in May 2004. The Court will assume that on May 11, 2004, the market value of the horses that Manula continued to own after July 2004 was $1,000 each.

Manula incurred incidental damages as defined in § 4-2-715(1), including transportation cost of $2,750, a cost of $156.60 for wormer, a veterinarian expense of $140 for dental work on Taco, and veterinary expenses totaling $230 for Butters.[3]  The incidental damages total $3,276.60.

Plaintiffs also claim lost profits as consequential damages under § 4-2-715(2).  Presumably, the lost profits were incurred by Lil' Outlaws Pony Camp, LLC, d/b/a Spraddle Creek Ranch, not by Manula individually, but the contract was between Rick Wheat and Kym Manula, not between Rick Wheat and the limited liability company.  Ark. Code Ann. § 4-86-101 provides:

> The lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer or seller of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer or seller might reasonably have expected to use, consume, or be effected by the goods.

Wheat knew that Manula was buying the horses for use in the trail riding business at Spraddle Creek Ranch, so the limited liability company was a person whom Wheat might reasonably have expected to use or be effected by the horses and therefore can recover damages for breach of warranty.

The revenue of the trail riding business obviously depends upon the number of rides that can be sold.  The number of rides that can be sold depends upon how many persons are willing to pay for riding the horses and how many horses are available to be ridden.  Manula had 17 horses for the 2003 trail riding season.  After she entered into the contract with Wheat for delivery of 30 horses in May 2004, she sold most of the 17 horses so that she would not have to feed them over the winter. The previous owner had operated with 30 horses in 2002, so the delivery of Wheat's horses should have provided the operation with the same number of trail riding horses that it had had in 2002.

---

[3] The veterinarian bills in evidence (Plaintiffs' Exhibit 41) total $920, but the bills appear to include charges relating to horses other than those that Manula bought from Wheat.

15

Manula testified that because very few of Wheat's horses could be used in the trail riding business in 2004, she was forced to turn away business. She testified that she would borrow horses from the horse camp if customers called to make trail riding reservations before the horse camp filled up for the day, and when that happened she would sometimes have to turn away business at the horse camp. Manula says that the failure of the business to generate the expected revenue in 2004 impaired her ability to buy horses for the 2005 and 2006 seasons, so plaintiffs claim lost profits for those years as well.

As mentioned above, Manula engaged Angela Hopkins, a certified public accountant, to calculate her damages. According to Hopkins, the lost business income caused by the fact that the horses delivered by Wheat in May 2004 were not suitable for use in the trail riding business amounted to $80,700 in 2004, $38,500 in 2005, and $24,400 in 2006, for a total of $143,600. Hopkins assumed that if Manula had had 30 trail riding horses in 2004 she could have achieved 90% of the number of rides that the previous owner had achieved in 2002. Hopkins also assumed that Manula would have offered hayrides if the horses had been broke to pull wagons. She calculates damages for 2004 as $80,400, including $9,000 lost in hayride business. Because it was not proven by a preponderance of the evidence that the contract required that the horses be broke to pull wagons, the Court will disallow the $9,000 in lost profits attributable to hayrides.

For the year 2004, it has been proven by a preponderance of the evidence that Lil' Outlaws Pony Camp, LLC, suffered lost profits in the amount of $71,700 as a result of the fact that approximately 26 of the horses delivered by Wheat were not fit for the particular purpose for which they were required. Lost profits can be recovered for 2004 pursuant to § 4-2-715(2)(a) because by the time Wheat delivered the horses it was too late to cover (buy replacement horses) for the 2004 season.

Manula testified, and Hopkins assumed in her damage calculations, that the failure of the business to generate the expected revenue in 2004 impaired the business in 2005 and 2006. However, the Court will not award lost profits for 2005 and 2006. Manula had ample time to purchase replacement horses before the 2005 and 2006 seasons. She argues that she could not do so because Wheat's breach of contract caused the business to fail to generate sufficient revenue in 2004. Manula's problem is that her business was undercapitalized, but Wheat cannot be held responsible for that fact. Based on her own projections at the time and on her expert's *post hoc* calculations, Manula should have been able to obtain financing to purchase horses for the 2005 and 2006 seasons, but she did not. In denying the claim for lost profits in 2005 and 2006, the Court follows *Lewis v. Mobil Oil Corp.*, 438 F.2d 500, 508 (8th Cir. 1971), where the Eighth Circuit held that a defendant that had breached the warranty of fitness in furnishing lubricating oil for a hydraulic system in a sawmill could be held liable for lost profits while the sawmill was using the unfit lubricant but could not be held liable for lost profits after the plaintiff discovered that the lubricant was unfit. The Court explained:

> The failure to produce at full capacity during the period when he was not using Amberx 810 was not due to a breach of warranty but was clearly due to the plaintiff's capital resources. The defendant oil company cannot be held responsible for the capitalization of plaintiff's business. If it is indeed the case, as plaintiff contends, that there was a readily available market for his extra production at a reasonable profit, surely there were conventional sources available to finance this production. The defendant is not in the business of extending credit to manufacturing enterprises and should not be held liable for these alleged damages.

*Id.*

In summary, Wheat knew that he was delivering 30 horses on the eve of the trail riding season in 2004. He knew or should have known that Manula's business needed those 30 horses for the 2004 season. By the time the horses were delivered and it was determined that they were

17

unsuitable, it was too late for Manula to buy replacement horses for the 2004 season, so lost profits for the 2004 season are recoverable. On the other hand, Manula had ample time to buy horses for the 2005 and 2006 seasons. She apparently replaced some but not all of the 30 horses because her business was undercapitalized and because she did not obtain conventional financing to buy the horses that she needed. Wheat is not responsible for lost profits in 2005 and 2006.

## CONCLUSION

Rick Wheat breached the contract in several respects. Most importantly, with respect to 26 of the horses Wheat breached the implied warranty of fitness for a particular purpose. As mentioned above, he breached some of the express warranties in the contract between him and Manula. Damages will be awarded to Manula in the amount of $9,914.61 plus $3,276.60 in incidental damages for a total of $13,191.21. Damages will be awarded to Lil' Outlaws Pony Camp, LLC, in the amount of $71,700. A judgment will be entered separately.

IT IS SO ORDERED this 5th day of October, 2007.

*J. Leon Holmes*

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE